NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 7, 2009
Decided January 15, 2010

**Before**

RICHARD A. POSNER, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 08-2235

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*, | Appeal from the United States District<br>Court for the Central District of Illinois. |
| *v.* | No. 07-20025-001 |
| JABARI A. VEALS,<br>*Defendant-Appellant*. | Michael P. McCuskey,<br>*Chief Judge*. |

**ORDER**

A jury found Jabari Veals guilty of possessing crack cocaine for distribution. *See* 21 U.S.C. § 841(a)(1). At trial the government introduced incriminating statements that Veals had made with his lawyer's approval during a post-indictment debriefing. The debriefing was conducted under a conditional grant of informal use immunity, but when Veals later breached a reciprocal promise to testify before a grand jury, the government revoked his immunity and used the statements to bolster its case at trial. Veals contends for the first time on appeal that the debriefing violated his right to counsel.

**I.**

Police in Decatur, Illinois, obtained a warrant to search a second-floor apartment rented by David Parker. A team of officers broke down the front door after they announced their purpose but there was no response. As they entered the apartment, another officer stationed outside watched Veals jump from an upstairs window in the apartment and take off running. He was promptly captured. The search uncovered 56 grams of crack in a jar of hair gel that was shelved with items belonging to Veals.

A week later Veals was charged by complaint in federal court with violating § 841(a)(1). He made his initial appearance on the complaint that same day, and an assistant federal public defender was appointed to represent him. Veals was facing a mandatory life sentence because of the quantity of crack and his nine drug convictions, *see* 21 U.S.C. § 841(b)(1)(A)(iii), and after conferring with his lawyer, he quickly resolved to cooperate with the government.

Three days after the initial appearance, Veals executed a cooperation agreement that obligated him to provide the government with complete and truthful information and, if called upon to do so, to testify before "any grand jury." In exchange the government promised that it would not make direct use at trial or sentencing of statements Veals made under the agreement, except to impeach his credibility or to rebut contrary statements at trial. The government also agreed to consider moving for a sentence below the statutory minimum if Veals provided substantial assistance. But all of the government's promises, including the limitations on using Veals' statements, were conditioned on his "complete compliance" with his reciprocal promises.

Veals' relationship with the government got off to an encouraging start. Veals, who was detained pending trial, sat down for a debriefing at the jail with Detective Edward Root of the Decatur police department and Special Agent Jeffrey Warren of the FBI. Veals' lawyer knew about but elected not to attend the meeting, which took place on February 2, 2007, just two weeks after Veals signed the cooperation agreement. During the interview Veals described his living arrangements with Parker, who provided him sleeping space in exchange for crack. He also admitted that he used Parker's apartment to sell crack obtained from a local dealer named Magic. He told the interviewers that Magic had supplied the crack in the jar of hair gel, which he intended to sell. Shortly after that session, Veals was indicted on the same charge included in the federal complaint, and the parties began working toward a plea agreement.

Then in August 2007 the government subpoenaed Veals to testify before a grand jury. When he refused, the government requested an evidentiary hearing to establish that Veals had breached the cooperation agreement, and that his interview statements were thus

admissible at trial. At that hearing defense counsel confirmed that he was not present for the February 2 debriefing, but he also conceded that, as far as the outcome of the government's motion, whether he attended or not was a "distinction without a difference." Veals did not testify, or even suggest, that his lawyer was absent without his approval or against his wishes, and counsel effectively conceded that the cooperation agreement had been breached by Veals' later refusal to testify. The district court reviewed the written agreement and concluded that Veals had given up his informal immunity by not honoring the grand jury subpoena. The district court twice asked the prosecutor if Veals had been entitled to *Miranda* warnings before participating in the February 2 interview; both times the prosecutor said no, and both times defense counsel remained mum.

At trial the government called two of the officers who executed the search warrant. One described entering the residence, and the second testified to seeing Veals jump out the window. David Parker, now a government witness, told the jury that Veals had been living in his apartment for months. He described the living arrangements, including their agreement that Veals would pay rent with dime bags of crack. He said Veals slept on a mattress in the living room and kept his belongings on nearby shelves. Detective Root, who also helped search the apartment, testified that the items on those shelves included a shaving kit, a toothbrush and toothpaste, a Bible, some $2 bills inscribed with Veals' name, and the jar containing the crack. Root, without objection, also recounted the admissions Veals made during the February 2 debriefing. Special Agent Warren corroborated Root's testimony about the interview, again without objection.

Veals was the sole witness for the defense. He testified that he lived with his girlfriend, not with Parker, and that he was at Parker's apartment the night of the search only because one of his friends needed a haircut. Veals insisted that he first met Magic at the apartment that night, and that Magic departed just moments before the police arrived. He denied seeing the jar of hair gel before trial. He said he was unaware that a team of police officers was present before he was tackled on the street. Asked why he jumped out the window, Veals said he heard a knock at the door followed by a female guest screaming, "They's gonna kill us."

The jury found that Veals had possessed 50 or more grams of crack with the intent to distribute. He was sentenced to life imprisonment. On appeal, through new counsel, Veals contends that the district court committed plain error by allowing Detective Root and Special Agent Warren to testify about his admissions at the debriefing. That debriefing, asserts Veals, was conducted in violation of his right to counsel under the Fifth and Sixth Amendments.

**II.**

We begin with the Fifth Amendment.  Veals makes the narrow argument that Detective Root and Special Agent Warren were obligated to administer *Miranda* warnings before questioning him at the debriefing.  Because they did not do so, according to Veals, the debriefing was a custodial interrogation that violated his Fifth Amendment right to counsel.  But Veals waived this claim by passing up the opportunity to raise it in the district court.  A defendant in a criminal case who knows about but elects not to pursue an objection waives any claim of error, *see United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009); *United States v. Brodie*, 507 F.3d 527, 531 (7th Cir. 2007); United *States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000), and that is what happened here.  The government alerted Veals that it intended to offer his statements at trial, and at the hearing on the government's motion, the district court pointedly raised the question about the need for *Miranda* warnings at the debriefing.  The prosecutor was resolute in insisting that warnings were unnecessary, and that position could not have gone unnoticed by counsel for Veals, who actively participated in a running discussion with the prosecutor and the court.  Under these circumstances, defense counsel's pregnant silence in response to the court's inquiry about *Miranda* was more than a forfeiture; it was a waiver.

That is enough to reject this claim, but for the sake of completeness we also note that it lacks merit.  The Fifth Amendment right to counsel protects persons in police custody against coerced self-incrimination.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *United States v. McClellan*, 165 F.3d 535, 543 (7th Cir. 1999); *United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994); *Sulie v. Duckworth*, 689 F.2d 128, 129 (7th Cir. 1982). The *Miranda* warnings were formulated as a procedural precaution to safeguard that principle, and to address concerns that police were using in-custody interrogations to wrench confessions from suspected criminals.  *Miranda*, 384 U.S. at 467; *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998).  But warnings are not mandated when the person is not in custody, *see, e.g., United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006); *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999), or when he has waived the Fifth Amendment rights underlying the warnings, *see Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Allen v. Buss*, 558 F.3d 657, 669 (7th Cir. 2009); *United States v. Carson*, 582 F.3d 827, 833-34 (7th Cir. 2009).  Both of these limitations are present here.

A suspect is in custody for purposes of *Miranda* only if a reasonable person in his position would conclude that he could not leave the presence of the authorities.  *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2009); *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008); *Barker*, 467 F.3d at 628; *United States v. James*, 113 F.3d 721, 727 (7th Cir. 1997). If the person questioned is already incarcerated, the inquiry turns on whether a reasonable inmate in his place would believe that the setting of the interrogation added new constraints to his freedom.  *Illinois v. Perkins*, 496 U.S. 292, 297-98 (1990); *United States v. Menzer*, 29 F.3d 1223, 1232-33 (7th Cir. 1994); *United States v. Willoughby*, 860 F.2d 15, 23 (2nd Cir. 1988);

*Leviston v. Black*, 843 F.2d 302, 303 (8th Cir. 1988). In *Menzer* we held that an inmate who sat down for a voluntary interview knowing he could leave the interview room at any time was not in "custody." 29 F.3d at 1232-33. As with the defendant in *Menzer*, Veals was incarcerated, and he attended the debriefing because he hoped to benefit from cooperating with his interrogators. He has never contended that he was not present voluntarily, or that he was thwarted from leaving the interview room after the debriefing started. And since Veals voluntarily executed the cooperation agreement, the only inference that can be drawn from this record is that he could have elected not to attend the session, or to cut it short at any time. Nothing in the record suggests that the setting of the debriefing or the conduct of the two interviewers added any further constraints on Veals' freedom.

More importantly, law enforcement officials are not required to administer *Miranda* warnings to a person who has voluntarily waived his underlying Fifth Amendment rights for the very purpose of inducing an interview. *See Sweeney v. Carter*, 361 F.3d 327, 331 (7th Cir. 2004); *United States v. Scruggs*, 356 F.3d 539, 546-47 (4th Cir. 2004). If the defendant did not make an express waiver, courts may infer one from his conduct; we and other circuits have found waivers when, as here, the defendant, acting with the knowledge of his lawyer, volunteered incriminating information pursuant to a cooperation agreement with the government. *See, e.g.*, *Sweeney*, 361 F.3d at 331; *Scruggs*, 356 F.3d at 546-47; *United States v. Bad Wound*, 203 F.3d 1072, 1075 (8th Cir. 2000); *United States v. Resto*, 74 F.3d 22, 27 (2nd Cir. 1996); *United States v. Lawrence*, 918 F.2d 68, 72 (8th Cir. 1990); *United States v. Wiggins*, 905 F.2d 51, 52 (4th Cir. 1990); *United States v. Wise*, 603 F.2d 1101, 1104 (4th Cir. 1979). Veals and his lawyer negotiated the cooperation agreement because Veals *wanted* to talk to authorities. Veals attended the debriefing voluntarily, with the knowledge of his lawyer, and with the hope of profiting from the cooperation agreement by making the very statements he now seeks to exclude.

We turn, then, to the Sixth Amendment claim, and at the outset it is critical to rule out the arguments that Veals is *not* making. Veals does not contend that the government conducted the debriefing without the prior approval of his lawyer. Nor could Veals make that assertion because counsel conceded that he endorsed the session, and he was fairly certain that an investigator from his office attended with Veals. (Counsel could not verify that belief because the investigator had died before the hearing on the government's motion, but Veals was present in the courtroom and made no effort to contradict his lawyer's representation.) As long as counsel had notice of the debriefing, waiver is implied. *See United States v. Ming He*, 94 F.3d 782, 794 (2nd Cir. 1996) ("Defendant and his counsel should be given reasonable notice of the time and place of the scheduled debriefing so that counsel might be present. A cooperating witness's failure to be accompanied by counsel at debriefing may later be construed as waiver, providing defendant and counsel have had notice so that the consequences of counsel's failure to attend could be explained to

defendant."). Moreover, Veals does not assert that he asked to contact his lawyer either before or during the debriefing. Instead, Veals simply argues that, after he invoked his Sixth Amendment right to counsel, the government was forever prohibited from speaking to him without counsel present.

This particular claim was not waived because, in contrast with the *Miranda* argument, it was not discussed at the hearing on the government's motion. But, still, the claim was forfeited by the failure to raise it in the district court, and Veals thus concedes, as he must, that our review is for plain error only. *See United States v. Murdock*, 491 F.3d 694, 698 (7th Cir. 2007); *United States v. Johnson*, 223 F.3d 665, 668 (7th Cir. 2000). We see no error, much less plain error.

It is well settled that a represented defendant can elect to waive his right to counsel without first speaking to an attorney. *See Michigan v. Harvey*, 494 U.S. 344, 352; *Patterson v. Illinois*, 487 U.S. 285, 293 (1988). Until several months after oral argument in this case, there was, under *Michigan v. Jackson*, 475 U.S. 625, 636 (1986), a prophylactic rule that barred police from approaching represented defendants. The Supreme Court invalidated that rule in *Montejo v. Louisiana*, along with the notion that the waiver of a represented defendant's right to counsel is presumptively invalid. *See* 129 S.Ct. 2079, 2091 (2009). After *Montejo*, Veals' Sixth Amendment argument has no legs to stand on: either he waived his Sixth Amendment right to counsel by initiating the debriefing, *see Harvey*, 494 U.S. at 352; *Brewer v. Williams*, 430 U.S. 387, 403 (1977), or he waived it by consenting to a government-initiated debriefing, which, under *Montejo*, is now permissible, *see* 129 S.Ct. at 2091. In either case, as his trial counsel observed, whether or not his lawyer was present is a distinction without a difference.

All of this leads to one further observation: even if Veals had demonstrated that his debriefing statements were admitted at trial in violation of his right to counsel, the error would have been harmless beyond a reasonable doubt. Subtracting the marginal value of the proffered statements, the government still marshaled sufficient evidence to convince a jury beyond a reasonable doubt that the crack in the jar of hair gel belonged to Veals. The government presented testimony that Veals lived in Parker's apartment and paid rent with crack; that he slept in the living room and kept his belongings on nearby shelves; that he jumped out of a second-story window when the police arrived with a search warrant; and that officers discovered more than 50 grams of crack in a jar of hair gel stored with his other personal items. Even without the debriefing statements, the case against Veals was overwhelming.

AFFIRMED.